has a seat. So we may proceed consoles. If you'll approach the post, I'm sorry, call the next case. Castle. Good morning. Morning. Runner. Paul Feinstein, counsel for Michael Monticello, who's the appellant in the cross happily and Michael Roberts, counsel for the cross appellant. What time do you need consoles? Justices. I would just want to reserve five minutes to rebut. My question to the court is, since there's a cross appeal, do you want me to deal with that in my first go around as well? Yes, happy to do that. Your honor, I may have some time as long based upon your previous statement that you're somewhat generous with your time. I'm going to guess that it'll probably take about 25 minutes subject to whatever kind of questions that would also the your honors may have as well. Castle. Thank you, Justice. May it please the court. Once again, I'm Paul Feinstein. I represent the appellant, the cross appellee, Michael Monticello. This is a one issue case in a post-dissolution of marriage case. And justices, I'd like to focus in on two primary aspects of that, which resulted in the trial court erroneously ordering $6,600 a month child support, which comes to a little over $79,000. A year. Michael, as we know, is a W-2 employee. He's not self-employed. He's not unemployed. He's not a person who doesn't file tax returns. Yet the trial court didn't handle the sine qua non of a child support case, which is to determine his net income. It's from that determination that everything else follows, because we have the guidelines. The guidelines then either apply or they do not when you deal with and assess the statutory factors. 505A1 says the court shall mandatory determine the minimum amount of support by using the guidelines and so forth. And also, it's in the case law, the Corona's case, which I cited, that the court must determine as a prerequisite the net income. Also, since there's a modification in this case, the court has to find a substantial change of circumstances. And we had the previous income, and now it has to find what's the new income in order to determine whether or not a modification is appropriate. So address that issue. Was there a substantial change in income or change in circumstances? I don't believe there was, Justice, either as to the expenses, which I'll get to in a bit, unless you want me to handle it now, or the income. The gentleman's income, and we had the evidence of it. Historically, he was earning somewhere in the $200,000 to $300,000 range. He did have the one year in 2007 of, I think, $624,000, something like that. But keep in mind, that was the year he switched jobs. He had a rollover. He had a signing bonus. He had the two employers paying. So that wasn't really reflective of anything when you look at the other years. I mean, it was essentially $200,000 to $300,000 in that ballpark. And that's what he had before. No change in income except for one year. That's your position. His income did go up, but that was taken into account in the 2005 order. Because remember, there was a child support of about $2,600 a month, of a couple dollars off, plus a percentage of his bonus. Was there a change in the needs of the two children? I don't believe there was a change in the reasonable needs as we go through this. Because I think that the main increase was this Irish dancing, which of course was a large issue in the case. That's a $17,000 a year expense. And the import of the ruling bumping the income up from $2,600 plus the bonus to $6,600 a month, $80,000 a year, is my client is essentially paying for the Irish dancing. The Irish dancing and the children going to school, because when they got the divorce, the children were young, four, five, or six, and then they went to private school. Right. So the schooling, the Irish dancing, and then with the Irish dancing, I assume that as they went on, because they were nationally known, that they ended up being a top Irish dancer and then traveling all over. And then, counsel, would you agree probably that the expenses of kids as they grow older increase? They generally do, certainly. But I don't think that it was substantial. I think we showed in the record that if you take out the Irish dancing, essentially the increase is about $170 a month, which isn't that substantial. Keep in mind, Justice, that my client, under other orders, is already paying, and he's paying half of private school. He's paying half of uncovered medical. He's paying a number of other things, irrespective of that. So even if those go up, that increases his obligation as well. But there really wasn't any reason to go, again, from this amount, and even with the bonus maximized, as we had in there, he was paying her about $53,000 a year, child support. Now we're at $80,000 a year. So when she filed this in October of 07, that year his income was approximately adjusted with the bonuses and everything, it was like $607,000. It was something along those lines. Which was a lot more than the year before and the year before that. So in fact, his income had increased. But his income was back down at the time of the trial. Keep in mind, the case was tried in 2009. The decision came out in 2010. And by then, his 2008 income was back down in the $300,000 neighborhood, nowhere near the $600,000. And the court didn't, our problem is, to get back to it, if I may, the court didn't find what his income was. Well, Counselor, doesn't it appear that the court averaged, utilized the income averaging approach? Justice, I respectfully disagree with that contention that Counsel, who obviously realized the problem, since there was nothing in terms of finding of income. He did some math and said, well, yeah, this court could have income averaged. But the problem is, again, there is absolutely no indication in the record that the court did that. And there is a separate analysis that has to be done when that's done. First of all, the court has to indicate why it should income average, which it didn't do. And as I indicated in the brief, and as I stated before, that's usually done in a case where we don't have, you know, a set W-2 employee. We have somebody who's self-employed, who manipulates income, who's unemployed. We have to find another way to do it. But the point of the cases that allow the income averaging, say, well, the point of that is we can help determine what prospective income is. In other words, we use the history to say this is probably what he's going to make. There is nothing in the record that indicates that he's going to make anything close to $600,000. And then when you use a three-year average, and one of the years is 600, obviously that skews the average up from $200,000 to $300,000 to whatever they said, $450,000. But again, there's no way to determine, excuse me, whether the statute was complied with because the court didn't say, well, we're going to average, and here's what it is, and here's what a guideline would be, and we're either going to apply it or we're not going to apply it and tell you why. They didn't do that. I mean, it's clever briefing by counsel to say, well, yeah, income averaging, you get to about the same number, but you don't get there in the right way. It's not a proper method. Either way, whether you're income average or not, you still have to, under the statute, determine his income. So the trial court also, in determining the income, would it be inappropriate to consider options, stock options, as an example? I don't believe it would be inappropriate, Justice. That's not the subject of W-2. Sometimes they are and sometimes they aren't, but whether they are or not, and my client testified that these particular options were under water as well. But counsel in the briefing, I believe, adds the options in anyway to get to these particular numbers, and again, the court didn't determine one way or the other. Court didn't say, well, his W-2 income is X, his options are Y, his this and that is Z, and we get to A. Trial court didn't do any of that. Trial court essentially threw up his hands and says, I'm picking a number, 6,600. We do agree, though, that income is from any and all sources, not only his W-2 forms, but bonuses, and any money he gets, and there may be some exceptions in the code we have to look at, but basically, any and all sources. Yes. Okay, we agree on that. Certainly, and under the Rogers case and the cases that have come down in front of him, unfortunately, one of them being mine, it's a fairly expansive look. But that's fine. We're not really at issue as to what determinations or what aspects of his income existed, but again, no income, no findings. The court said, in fact, there was insufficient evidence of the income, which, of course, was not the case. Everything was brought in. There was testimony. There were documents, and again, it's not a sufficient reason. It was clearly ascertainable. The statute that the court used, now, this is important, in 505A.5, there are a couple of provisions. Number one, that it says, if the net income, if I can quote it, it's in the appendix, cannot be determined because of default or any other reason, the court shall order support in an amount considered reasonable in the particular case. That appears to be what the court invoked, but that's limited to situations where the income really cannot be determined. Not where we have someone in court with the documentary evidence and with the testimony, it was all there. Now, later on in the statute, there's a provision that, in practice, is used when we have someone with a salary and bonus and, as a matter of fact, was ultimately what was done in the 2005 agreed order. Remember, it was a certain dollar amount plus a percent. And that's when all or a portion of the net income is uncertain as to source, time of payment, or amount, excuse me. And in that case, the court can order a dollar amount plus a percentage, which, again, was exactly what was done in 2005. Now, that's really more what we're talking about. He gets bonuses. We don't know what they are. But, again, the parties provided for that in the 2005 order. They said, up to $125,000, we're going to pay guidelines. Beyond that, we're not going to pay. And that's what the trial court then undid that negotiated settlement. Another indication that the court didn't income average or, to that extent, didn't make the determination of income is when the court stated in the order that Michael obtained new employment, which may have increased the amount of his annual income. The judge wasn't even sure. Did he make $1,300,000 over the three-year span, six, seven, and eight? Six, seven, and eight. I think there might have been a double count in there somewhere. But he did have, again, the income. I'm sorry? The earnings, I think, were around $300,000 for two of the years, maybe around $400,000. And another one of the years, I think, again, there was an IRA rollover of over $100,000. So whether you count that as income or not. But, again, that was a one-time deal. The bonus is a one-time deal. And, again, when you're going to determine, if you're going to average to get something prospective, again, I don't think you should include one-time shots. And I think you have to also look at the gentleman is a banker, 2007. But the case law supports that. Case law supports that. Averaging. There are cases that have allowed income averaging under certain circumstances, Justice, I believe. When you suggest, when you argue that you should not include one-time shots. Correct. That's part of the averaging. Well, it's, it is, but I think that it's misleading if you do that. In this case, I think it's an abuse of discretion to basically say, if the numbers are right, that he earns an average of, let's say, $450,000. When he never earned $450,000. He earned $300,000, he earned $300,000, he earned $600,000. And there's no evidence he's ever going to earn $600,000 again. I'm sorry, Justice Steele, I didn't mean to interrupt you. What did you allege his income was for 6, 7, and 8? 3, 3, and 4. 4, I'm sorry? 3, 3, and 4? 3. Is that what you said just a moment ago, 3, 3, and 4? I believe so, for those, for those years. Okay, all right, thank you. For 08, and again, the trial took place in 09, and the decision in 2010, okay? But again, when you figure in a child support amount, the judge didn't do what the parties did in 2005. Now, we know he earns a certain income, a good portion of it is bonus. When you order 6,600 a month, 80,000 a year, you're assuming he's going to get a certain amount of bonus. If he doesn't get that bonus, or if it's less, then the gentleman is in a problem. So, in a situation like that, the better course was exactly what the parties did in 2005, was to say, well, we'll base it here on the salary. His salary now, I think, is 193, actually, and the bonus varies, and then give a percentage of the bonus. So, if he gets it, she gets it. If he doesn't get it, he doesn't have to pay out of money he doesn't get. That's the only fair way. Concerning the amount of the child support, as we know, the court has to balance two competing interests. Number one is to avoid windfalls, as the case law indicates, and also to provide a standard of living for the children that they would have enjoyed absent the divorce, but not without limits, because, of course, that's a hypothetical situation had the divorce not taken place. The 2005 order allowed, again, a guideline amount, generous amount, and 28% of any bonus up to $125,000, that more than would cover, and did more than cover, any reasonable need of the children. The parties, in fact, realized that a strict guideline award in 2005 would be a windfall, because otherwise it would have just been straight 28% of whatever he gets. It was a perfect fit for this case and for these parties, and the parties agreed to that. But at some point, child support becomes a windfall. Mr. Monticello, as I indicated, also has to contribute to the private school, health insurance, uncovered medical insurance, and all those other things, and he's entitled to live, too. Now, in fact, in Michelle's written closing, I want to point out that they only asked for $6,260 a month. That's in the second supplemental record. They based it on income of $410,000, and I submit, even if his income had been that high for the year, guideline award would be a windfall. Can the court properly consider the closing argument? Earlier, you suggested that the court did not articulate its method of arriving at the $6,600 child support. That's correct. Does the law permit the court to consider the closing arguments of the party? As you point out, Michelle asked for $6,600. Well, it's not evidence, but my point was that the trial court even exceeded what she asked for at the trial. It's implicit, though. Which is a, I'm sorry, what is implicit? It's not evidence as such. Right. It's not evidence. Absolutely. But would it be inappropriate for the court to arrive at, in this case, the $6,600 while considering the closing arguments of Michelle here? I believe that it's inappropriate because of the failure of the court to take what proof actually happened and to follow the statute, which it was mandated to do. It didn't follow the statute in any way. So, essentially, your position is the court abused his discretion by not following the statute? By not following the statute. Exactly, yes. And even so, had the court made a finding, let's say, had the court income averaged, had the court said, I find his income or his average income to be $400,000. Again, the court didn't analyze whether applying the guidelines was fair, but I submit that applying guidelines to a $400,000 income is a windfall as well. And we've cited the Singletary and the Bush cases, and there are many such cases talking about windfalls that at some point, enough is enough, essentially. In terms of the number, again, the case really comes down to the $17,000 a year extra for the Irish dancing, which Michelle never asked Michael about. He never agreed to it. It's not reasonable. Well, he traveled all through the Midwest observing his daughters participate in these various programs and performances. Is that correct? I think he went to one or two of them. Yes. So you say he never agreed to it? He didn't agree to pay for it. If the couple had remained married and these children were Irish dancers, with the income that they had, do you feel that they would not have allowed the children to do this? Well, I feel that my client should have the opportunity, had he been married, to say, you know what, honey, this is great, but $17,000 a year, we can come up with better uses for that money. Even the fact, as the evidence was, that the classes themselves, I think, were $5,000 a year, and then the competitions were an extra $12,000, which Michelle said she admitted it was her choice. She decided to do it. Well, since they're not married, she got to choose. He didn't get a vote. And if they want to go do that, wonderful. But for him to really have to pay it, which is the import of the decision, I don't think is equitable under the circumstances. He should have had more of a say in that. It still has to be reasonable. I mean, $53,000 a year under the 2005 order is certainly a good standard of living. I don't believe that. Did he have an opportunity to voice his objection to this expense prior to the filing of this matter? Did he have that opportunity? No, because it wasn't an issue. I mean, they didn't have this expense when they were married. Exactly. It wasn't an issue. And then? When he traveled, what was it, to Ohio or somewhere else, it was not an issue. I don't think he could have said, you can't go. I mean, she had the kids. Again, $17,000 a year. And as I indicated, it has to be a substantial increase. And outside of that, not a substantial increase. Michelle made choices, as I indicated. The Irish dancing. The whole thing about not paying debt down. Keeping money in the savings account. To buy a lot. Working part-time. That's fine. These are all choices she gets to make as a divorced woman. But it's not fair to stick Michael with the cost, which is really what the trial court did. And importantly, with respect to the guidelines, there's a public policy. And the reason we have guidelines is for consistency and certainty. And we won't have either of those if trial courts are allowed to sidestep the guidelines this easily. Before this issue came up on the Irish dancing, my recollection was he was paying her an average of about $4,200 a month for support. Is that correct? Yes. It was like $53,000 a year it came to, because the bonus maxed out. So the difference when we're talking about the bottom line difference is $2,000 a month. Because he was paying $42,000 and the judge said $65,000 or something. So the difference is a couple thousand. The difference is between $53,000 and $79,000. Okay. The justice, whatever that is, monthly. If I move on to the cross appeal, unless the justices have any more questions on that. There were two issues, both within the trial court's discretion. One was retroactivity of the increase in child support, which Michelle was claiming she should get in addition to this $80,000 a year, $65,000. Which we maintain is nothing but ERSAT's maintenance. It's not necessary. It's a windfall. Now in terms of the date, she claimed in her brief that she should get relief retroactive to January 2007. I just want to make sure the justices understand the timing. The petition wasn't even filed until October 2007. That wasn't noticed up until January 2008. And from there, you know, she makes various complaints about the time frame. But essentially, the bottom line is that there wasn't one instance of willful noncompliance by my client. The delays were essentially inherent in the system. Justice Kaplan's call, how long he took to decide. My client, I think, did change lawyers once, which he's entitled to do. But the trial court, when ordering this $80,000 a year, exercises discretion. He said, well, you know, that's enough. He's always paid a lot. He's paying more. I don't think she should get it retroactive. So he didn't abuse his discretion in this case? In this case, right, Justice. Well, we have a problem, though, counsel. She filed in October of 07. Yes. And I would agree with you, or I think you're saying that this, it took 33 months for the circuit court to determine an increase in child support, almost three years. He filed his response in February of 08, which is about five months after it was filed. We don't know when he was served. I assume he was served. He filed his response within 30 days of being served. I'm just making an assumption. The first hearing date was 06-08. But my wife's vantage point, she filed for an increase. Right. Why should she not get something if it took three years to determine this? There may be an issue of what date do we go back to, and this case law deals with what date she used, whether it's the date of filing, the first hearing date, the day he got notice. But it was no fault of hers that it took the court three years to decide what I consider a basic case. So why should she not get some retroactive child support if it took three years? Because since both of these determinations are discretionary, if your honors say, for example, well, we're going to affirm on the child support. We think 6,600 a month is fine. All right. The judge had that number in mind when he determined, I'm not going to give her retroactivity. So then to turn around and say, well, it was okay to give her 6,600 a month, but it wasn't okay not to give the retroactivity. I think they go together, as it were. I don't think it's an issue of whether she should be penalized. I think it's, you know, it's the trial court's call. And the trial court knows what his schedule is, and he knows what happened. And to answer your question, Justice Steele, my client did, he filed the response. It wasn't noticed up, remember, until January. That's when he got it. So he, you know, he filed an answer. There is no evidence in the record that he did anything wrong. So now you're talking about, particularly because the child support amount is so much, you're really talking about punishing him if you turn around and give her a $65,000 check, which obviously isn't necessary. I believe you have to go, or you should go, with what the trial court said. And I cited the Ingrassia case, which Michelle neglected to cite, which was another case where it took a long time, and there was a delay, and the court was asked to go back an additional two years, and they declined to do that. I believe that it's within the trial court's discretion. So is there anywhere in the record where the trial judge indicated that he was taking all of this into consideration, or are we just making this assumption? No, I believe there is in the order, if I could, let's see. It's paragraph 8 of the order. It's page A3 of the appendix to the white brief. I'll quote it. Michael is current in his child support payments pursuant to the March 25, 2005, agreed order. Michael has always paid substantial and reasonable amounts for the support of the children, and therefore the court finds that the modified child support amount shall not be retroactive and shall begin on August 1, 2010. So there is the court exercising its discretion and saying, you know, basically enough is enough. With respect to the issue of the attorney's fees, that also within the trial court's discretion, and keeping in mind that the trial court did order, you know, $80,000 a year. It was Michelle's burden as the move-in to show two things, that she was actually liable for the fees and that she was unable to pay them. And the court held that she failed to show either of those. And again, in the trial court's exercise of discretion, it noted that Michelle is represented by her husband, which was a proper analysis. Since at least one- What difference does that make? Well, the difference is- Is the husband entitled to a fee? The judge apparently believed that the husband was not going to charge his wife. Particularly, you look, there was an engagement agreement with zero dollars. So that was, again, the trial court's call. And at least since one reasonable person could conclude that he wasn't going to charge her, she can't show an abuse of discretion there. Didn't the parties agree that the hourly rate was reasonable? They did. They did. But they didn't stipulate that it was actually incurred. And again, that's her burden. Had it not been the husband, would the fee be reasonable? Well, had it not been the husband, I don't know if there would have been a stipulation. I mean, there was a stipulation that it was a reasonable amount. So there were two issues. Number one, did she incur it? Aside from the fact that the client was the spouse, the fee was reasonable. The hourly rate was reasonable. The hourly rate was reasonable. Right. If counsel, Michelle's attorney, provided these services for anyone else, would he be entitled to a fee? Well, under the circumstances, if he could show what he needs to show, which in this case also includes that she lacked the ability to pay. And that was the second prong. She didn't prove either of those. She clearly had money to pay him. It was in the account. And she had other resources. And, you know, as I've indicated, they chose, they made choices. Worked part-time, Irish dancing, saving money for a lot. The trial court found she was able to pay the fees. And again, at least one reasonable person would agree with that finding. Again, she's seeking another $15,000, which we maintain as a windfall. Don't think she's entitled to it. Your Honors, I would stand on my briefs respecting the other points, unless the Court has any other questions for me. For these reasons stated, we would ask for a reversal on our appeal and affirmance on the cross-appeal. Did the Court address Michelle's assets in discussing the award of attorney fees? In the award, if I may again go to the order, it's on the same page. It's the next paragraph. It states the Court has heard sufficient evidence to determine that each party has the ability to pay his or her own attorney's fees. And also, it took as a factor that Michael has been current in his support. And that she's represented by her current husband. The Court found that she should be responsible for her own fees. So the answer is yes. Nothing else? Thank you. Thank you. Thank you. Counsel. Good morning. May it please the Court. As you've heard, there are three issues that are before this Court this morning. One on appeal by Mr. Monticello. Two on cross-appeal by my client, Michelle Monticello. I will address the issues in the order that they were presented by opposing counsel. But I do want to make clear to this Court, as you may have already figured out, my name is Michael Roberts. I am the attorney for the cross-appellee. I'm sorry, for the appellee and the cross-appellant. I'm also the husband of Michelle Monticello. So in the course of discussing the matters with you, if you hear me refer to Michelle Monticello as either Ms. Monticello, Ms. Roberts, or Michelle, please understand that's my wife. I do not mean to disrespect this Court or my wife in any way. But I want to make it clear that that's the same person, the cross-appellant and the appellee in this particular matter. The first issue before the Court was the issue regarding whether or not the Court abused its discretion regarding setting the amount of support. And I'll first point out that the petition to modify support in this case was filed on October 30th of 2007. And the notice was actually served in January of 2008. I will acknowledge, as counsel points out, that in one of our briefs, our initial brief, we indicated that we were seeking retroactivity to 2007. That was a typographical error. We were seeking retroactive, which I will discuss a little later, from 2008, the date that notice was actually served upon Mr. Monticello's attorney, not directly Mr. Monticello, but Mr. Monticello's attorney, which I find somewhat significant, just to sort of explain as to why there was a delay between the date of filing and the date of service, because it appears that there was some communication between my client, Pro Se, with the attorney that was representing Mr. Monticello prior to, or up to, January of 2008. My, for the record, my representation of my wife did not take place, or did not start or commence, until June of 2008, when this matter was actually commenced. And the fees, when we get to that particular issue, were based upon representation of my wife from that point, June of 2008 forward. There are no fees that were incurred prior to that period of time. Now, in order to prevail on my, on the petition to modify, there must be a showing of a substantial change of circumstances. And I will just very briefly provide specific facts that existed as of March 24, 2005, when that, when the last court order was entered. The change of circumstances must occur between the time of the last order entered, and the period of time, and the time the petition is actually being filed. In Mar-, at the time of the March 24, 2005 order, the information that had been provided indicated that Mr. Monticello had earned $201,000 slightly over that, in 2003, and $212,000 in 2004. Mrs. Monticello's petition was filed in 2007. In 2007, Mr. Monticello's income was $624,369. In 2008, it was $362,000. And although I don't have it, we didn't have an actual amount of 2009, there was a calculation that could be included, and it could have been taken into account by the court, as to what Mr. Monticello's income was, even prior to the July 9th hearing. And what I remember specifically is, is that Mr. Monticello, at the time of that 2009 hearing, his base salary was $193,000. And at the time of that particular July hearing, he had already received bonuses in excess of $130,000 by July of 2009. So any suggestion that he was making only $300,000 in 2007, 2008, and 2009, is not supported by the record. In addition, as pointed out much more clearly in the brief, the individual expenses of these children increased by $1,260. Their expenses increased by $1,260, personally related, those expenses personally related to the children, increased by $1,260 between 2005 and 2007. Other expenses that peripherally affected those children increased by $1,390. Some of those expenses would be gas expenses, getting the children to and from their activities. Is that directly their expense? No, but it's something perfectly related to them. Cable television, Internet, things along those lines that children as they get older become much more, I don't want to say dependent on, but certainly become accustomed to. Based upon those limited facts, there's no doubt that a substantial change of circumstances. You're nitpicking on those because cable TV and all things you name, these are things that you and your wife use also. And that's why I'm suggesting the peripheral. So tell us things that Harvey affected the two kids. Those amounts were $1,290 that specifically addressed the expenses of the kids. Those dealt with summer camps, those dealt with educational camps they were taking during the summer, as well as during the school year. Obviously the Irish dancing expense was a substantial and significant expense as well, and all the expenses related to that. But those expenses were all brought out very clearly in the record by Michelle's testimony at the trial. The $1,260 was clearly addressed at the trial court. The counsel suggests that the court has a responsibility to provide a finding of what the net income is. And there's no case law, Karonis, the case cited by counsel, indicates that the court must determine what the net income is, but it doesn't say it must express it as an explicit finding, the reality is that if, in fact, the court does not deviate from the guidelines, it is not required to make any explicit findings. It need only set a guideline support amount. That's what happened in this case. The July 30, 2010 order of the trial court indicated support would be $6,600 a month. In order to calculate net income, it's a very simple calculation. You divide the amount of support that the court provided, $6,600, you divide that number by the percentage of guideline for the number of children, in this case, 28%, and that will provide you with what the net income of Mr. Monticello was as determined by the trial court. There's no statutory requirement, nor is there any case law that says the trial court must make an explicit finding as to what the net income was. Counsel would try to make it appear that there's a requirement of that because the court must make that determination, but nowhere does it say, I have to do that. Moving on now to the income averaging cases, counsel suggested that the case law requires that the court provide what their methodologies were, what the methodology was for determining that income averaging. There's no case law that says that. The statute doesn't require it either. The court is entitled to use income averaging, but the court is not required to explicitly provide how I did this, how I did that, and how I did this. I will note, and counsel recognized it as well, that the net income in this case was difficult to calculate. And the trial court recognized that. In its order, it specifically noted the difficulty of calculating Mr. Monticello's exact, and it's in there, that word is in there, calculating his exact net income. But the reality of it is, it was his duty to come to some sort of amount, and the trial court came to that amount. And it mentions, the court specifically mentions, that it used factors including the base salary, the bonuses, the stock options, the 401k contributions, and the miscellaneous other contributions. I want to address an issue that was brought up, addressing this aberration year, the $624,000 a year, okay? And what I want to make sure the court is aware of is that, and this was brought out in the trial court, is that the monies that were paid due to that change of employment were based upon options and shares that became vested automatically upon the purchase of his old business. He had worked for a prior employer, that bank got sold, five years of contract terms regarding options and all that, and stock shares, all became immediately vested. But the reality of it is, those stock shares and those options, all would have became invested anyways. He just got them quicker, okay, but they all would have been vested. And ironically, when Mr. Monticello took his new job, and we presented his contract, it was presented to him at the hearing, he acknowledged all of the benefits that he was entitled to at his previous employer were all included in this new contract.  So his income wasn't going to change, and hence, nowhere does anybody suggest his annual income is $620,000 a year. We don't suggest that, the trial court didn't find that. Instead, it was closer to $420,000 a year, or $436,000 I believe, as the court's calculation came out to be. That was the amount, because they recognized these additional amounts. Mr. Monticello suggested in his brief that the court took this figure out of nowhere. Nothing is farther from the truth. As your honors have recognized, the closing argument that Monticello provided in this case provided an explicit, detailed breakdown of what the amounts were over a specific three-year period, and actually did that calculation for the judge. And I'm assuming that the trial court probably looked at that, did his own similar calculation and said, this is the appropriate way to do that, and that's how that amount was reached. Mr. Monticello argues that the court could have deviated from the guidelines. And the court recognizes in the July 30th that it considered those factors. The reason being, the court had to. One of the affirmative defenses that Mr. Monticello filed in this case was that the court should deviate. So the court, recognizing that, I'm assuming, included in its order, I have considered the factors for deviation. Didn't say that it wasn't deviating, just said that it considered all of the factors for deviation. Excuse me. Mr. Monticello cites the Bush and Singletary cases. And we all acknowledge, anybody that is familiar with these cases, that those are the seminal cases regarding windfalls in child support cases. Certainly cases that should have been addressed, that should be considered when discussing this issue. However, what Mr. Monticello, and what they're failing to recognize is those cases represented facts, and even the holdings of those cases recognize those facts that are completely different from the facts in this case. The Bush case involved two custodial parents, I'm sorry, Bush involved a custodial parent seeking an increase of support. The case was a 1987 case, and at that time, the custodial parent was earning $85,000 a year. She was a doctor. The Singletary case, a 1995 case, the custodial parent was a bank vice president. And she was earning $75,000 15 years ago. In both of those cases, the court acknowledged that both parents, the custodial and the non-custodial parent, had the ability to provide for the children and their lifestyles independently. In this case, Michelle makes $24,000. Certainly. Is she in no position to independently provide for the needs of her children. I do want to point out something about the Singletary case, which a lot of people don't recognize. When you say she makes $24,000, you also have to acknowledge that that's a choice. She works part-time, right? And she could work full-time, and she is married and has a husband with income. I will address that. And actually, the reality of it is, Judge, there's no record, no information in the record to indicate that my wife could work more. Okay? There's nothing in the record that was ever presented. Nobody brought up the issue. Okay? It was just a mere inference that she doesn't work more. She acknowledged how much she worked. The fact is, she works part-time. It does. That's right. But there's a fact that was brought up at trial and since the period of time that it has been totally disregarded by everybody, my wife has been diagnosed with MS since 2005. Okay? Since the last order was entered. Nobody got into that for a particular reason. Okay? All we're saying is, yes, she can. And that's why I suggest that the court record doesn't reflect anything about whether she could have worked whether she could have gotten any more work. What the record does reflect is that while she was married to Mr. Monticello, she was a private school, a Catholic school teacher. When she divorced Mr. Monticello, she was a Catholic school teacher. She now is currently a Catholic school teacher. No evidence has ever been provided to indicate that she would, even if she were working full-time, would be receiving more than that. There is a burden on Mr. Monticello to show those facts. We can't presume those items. What we presume, counsel, is that everybody has an obligation to help take care of their children. And everybody has an obligation to work unless there's reasons why they can't. So we have to assume that she could work and we have to assume probably she could work part-time. But the facts are as they are in this case. Okay. I'm addressing, just returning back to the Singletary case, which is the case that, addressing windfalls, okay? In that case, the custodial parents had originally been receiving $894 per month as support. And she sought an increase of support to $3,000 per month. And the court said, no, that would be a windfall. But the court did award her $2,000 per month. Okay. The court doubled the prior amount of support she was receiving. Okay. And the court also required that the husband in that case be responsible for paying all of the extracurricular activities of the children. In this case, it's the opposite. In this case, Michelle is now the person that's, based upon the court's ruling, is now responsible for all of the expenses of the children. Whether they be extracurricular, whether they be travel related to it, all of that expense now has been placed on Michelle to be taken out of the $6,600 a month support payment. Counsel, why don't you tell us why you're entitled to retroactive? I'm moving there, Ben. We couldn't have timed it any better. Actually, and if I, I'm sorry, I'll address the issue, Your Honor. The retroactive, in this case, obviously, the law requires, 510 requires, that the court may award retroactive support as of the date of service of the notice of the petition from Michelle. And it says, the statute does say may. May. It's totally discretionary, and I, and I certainly recognize the court's concern with one, me stepping in front of this court and saying the judge, the court abused its discretion on this issue, but it didn't abuse its discretion on that issue. That is a difficult issue. And all I can say is that each fact of each particular issue requires a different analysis. And under these circumstances, it certainly appears to be that the court abused its discretion in denying that retroactive support. Because? In this particular case, Michelle filed that, served that petition on January. The case was set for hearing on June, in June, six months later, okay, or five months later, as the case may be. That case was ready to proceed, Michelle was ready to proceed the trial at that particular time. Mr. Marcello, at that point in time, files a motion to continue, okay? That motion to continue prejudices Michelle. This case should have been heard on June the 8th, okay? And counsel may sit here and say that it was nothing, it wasn't something that was done with intent to delay the proceedings. But in fact, it was, okay? It is a tactical decision to ask for a motion to continue the trial. And when it was done a second time, in March of 2009, and the basis for that continued was simply a scheduling error on Mr. Marcello's part, Michelle, once again, is being extremely prejudiced based upon conduct that she bears no control over. This is, these are instances that Mr. Marcello was completely in control of. And she continued to ask the court. There's, there's, there's, and as the Leyva case points out, where, in cases where there is a delay, and Leyva specifically addresses the issue of a delay based upon noncompliance with court discovery requests, okay, and I will note that, okay? But the purpose, okay, or the intention of Leyva is simply dilatory tactics will not be, will not serve as a benefit in cases such as this, okay? The court must recognize that the period of time that it's taking to hear these matters is certainly benefiting one party over the other party. Can you give retroactive support for the period of the court's delay? Pardon? The courts have recognized, okay, that, and there have been cases that recognize that there is a certain period of time, okay, that recognizes this is what it takes for a court to process a case and put that in there. As a matter of fact, in the Fadoom case that I cite, the party, the notice was served 14 months, it was 14 months between the date of service and the date of the actual hearing, I believe, I believe it was 14 months, and the retroactivity was only ordered for 9 months. There being a recognition that, in fact, there was a period of time that it takes for the courts to process these matters. But a period of 33 months is just simply out of the question, okay? And the Fadoom case, by the way, is the case which recognized that there's really a prejudice that occurs when a court, okay, is taking substantial amounts of time to provide a ruling. Okay, in this case, the evidence was that it had been completed in June of 2009, the ruling didn't come back, I'm sorry, in August of 2009. The ruling didn't come back until July 30th of 2010, a period of essentially 12 months, all of which was time that was in the control of the court, and Michelle is certainly being prejudiced, and as Fadoom notes, the party shouldn't be prejudiced due to the delay of the court under these circumstances. The final issue I'll address then before the court is the attorneys' fees issue, which is somewhat, it's a novel issue before the court, and as you may, well, anticipate, somewhat personal to me right now under these circumstances, okay? Before we get into that issue, let's take a five-minute break. Okay.